**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| ANTHONY KIEL, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIV. ACT. NO. 1:24-cv-314-TFM-M** |
| | ) | |
| SHERIFF ANTHONY LOWERY, in his | ) | |
| official capacity as Sheriff of Baldwin | ) | |
| County, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the *Motion and Incorporated Supporting Brief by Anthony Lowery, in his Official Capacity as Sheriff of Baldwin County, Alabama, in Support of his Motion for Summary Judgment*. Doc. 32, filed December 8, 2025. Having considered the motion for summary judgment, response, reply, and relevant law, the Court finds the motion is due to be **GRANTED**.

## I.    JURISDICTION AND VENUE

The Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 (federal question). The Court has personal jurisdiction over the claims in this action because the events that gave rise to this action occurred within this district. *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291-92 (11th Cir. 2000) ("Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint . . . . General personal jurisdiction, on the other hand, arises from a defendant's contacts with the forum that are unrelated to the cause of action being litigated. The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction, and require a

showing of continuous and systematic general business contacts between the defendant and the forum state."). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to the claims in this matter occurred in this judicial district.

No party disputes or debates the Court's jurisdiction or venue, and the Court finds adequate support for both.

## II. BACKGROUND

### A. Factual Background[1]

Plaintiff Anthony Kiel ("Plaintiff" or "Kiel") was employed as a deputy sheriff with the Baldwin County Sheriff's Office ("the BCSO"). Doc. 18 at 2. Huey Mack ("Mack") was the

---

[1] At the summary judgment stage, the facts are "what a reasonable jury could find from the evidence viewed in the light most favorable to the non-moving party." *Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) (quoting *Scott v. United States*, 825 F.3d 1275, 1278 (11th Cir. 2016)). "[W]here there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movant." *Id*. (quoting *Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016)). Therefore, the recitation of facts here are those construed in favor of Plaintiff. "The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts." *Id*.

A party is obliged to address an opposing party's assertion of fact that is presented in a motion for summary judgment pursuant to Fed. R. Civ. P. 56.

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or (4) issue any other appropriate order.

FED. R. CIV. P. 56(e)(1)-(4); *see also* S.D. ALA. CIVLR 56(b) ("The non-movant's brief must include: (1) all facts relied upon, each supported by a specific, pinpoint citation to the record: (2) all challenges to the movant's asserted facts; and (3) argument supported by legal authority as appropriate."); S.D. ALA. CIVLR 56(d) ("The Court will deem uncontroverted material facts to be admitted solely for the purpose of deciding the motion for summary judgment.").

Baldwin County sheriff when Kiel was hired at the Sheriff's Office and Defendant Anthony

Lowery ("Defendant" or "Sheriff Lowery") succeeded Mack in that position. *Id.* Kiel's Oath of

Office, which he signed and was also signed by Mack, states:

> I, Anthony Kiel, solemnly swear that I will support the Constitution of the United
> States, and the Constitution of the State of Alabama, so long as I continue a citizen
> thereof; and I will faithfully and honestly discharge the duties of the office upon
> which I am about to enter; and I will obey the orders of the Sheriff of Baldwin
> County and those in authority over me, to the best of my ability, so help me God.

Doc. 31-1 at 2.

The BCSO policy manual addresses topics that included "Speech, Expression and Social

Networking," "Standards of Conduct," and "Discriminatory Harassment." Doc. 31-2 at 2-17. The

"Speech, Expression and Social Networking" policy reads, in relevant part:

> **1021.1 PURPOSE AND SCOPE**
> This policy is intended to address issues associated with the use of social
> networking sites, and provides guidelines for the regulation and balancing of
> member speech and expression with the needs of [the BCSO].
>
> This policy applies to all forms of communication including, but not limit to, film,
> video, print media, public or private speech and use of all internet services,
> including the Web, email, file transfer, remote computer access, news services,
> social networking, social media, instant messaging, blogs, forums, vide and other
> file-sharing sites.
>
> Nothing in this policy is intended to prohibit or infringe upon any communication,
> speech or expression that is protected under law. This includes speech and
> expression protected under state or federal constitutions as well as labor or other
> applicable laws. For example, this policy does not limit a member from speaking
> as a private citizen, including acting as an authorized member of any employee
> group, about matters of public concern, such as misconduct or corruption.
>
> . . .
>
> **1021.2 POLICY**
> Members of public entities occupy a trusted position in the communication, and
> thus, their statements have the potential to contravene the policies and performance
> of the Baldwin County Sheriff's Office. Due to the nature of the work and influence
> associated with the law enforcement profession, it is necessary that members of this
> office be subject to certain reasonable limitations on their speech and expression.

To achieve its mission and efficiently provide service to the public, the Office will carefully balance the individual member's rights against the needs and interests of the Office when exercising a reasonable degree of control over its members' speech and expression.

. . .

**1021.4 PROHIBITED SPEECH, EXPRESSION AND CONDUCT**
To meet the safety, performance and public-trust needs of [the BCSO], the following are prohibited unless the speech is otherwise protected (for example, a member speaking as a private citizen, including acting as an authorized member of an employee group, on a matter of public concern):

. . .

(b)     Speech or expression that, while not made pursuant to an official duty, is significantly linked to, or related to, the Office and tends to compromise or damage the mission, function, reputation or professionalism of the Office or its members.   Examples may include:

1.     Statements that indicate disregard for the law or [sic] the state or U.S. Constitutions.

. . .

(c)     Speech or expression that could reasonably be foreseen as having a negative impact on the credibility of the member as a witness.   For example, posting to a website statements or expressions that glorify or endorse dishonesty, unlawful discrimination or illegal behavior.

Doc. 31-2 at 2-3.

The "Standards of Conduct" policy reads, in relevant part:

**316.1 PURPOSE AND SCOPE**
This policy establishes standards of conduct that are consistent with the values and mission of [the BCSO] and are expected of all office members.   The standards contained in this policy are not intended to be an exhaustive list of requirements and prohibitions but they do identify many of the important matters concerning conduct.   In addition to the provisions of this policy, members are subject to all other provisions contained in this manual, as well as any additional guidance on conduct that may be disseminated by this office or a member's supervisors.

**316.2 POLICY**
The continued employment or appointment of every member of this office shall be

based on conduct that reasonably conforms to the guidelines set forth herein. Failure to meet the guidelines set forth in this policy, whether on- or off-duty, may be cause for disciplinary action.

. . .

**316.4 GENERAL STANDARDS**
Members shall conduct themselves, whether on- or off-duty, in accordance with the United States and Alabama constitutions and all applicable laws, ordinances, and rules enacted or established pursuant to legal authority.

Members shall familiarize themselves with policies and procedures and are responsible for compliance with each.  Member should seek clarification and guidance from supervisors in the event of any perceived ambiguity or uncertainty.

Discipline may be initiated for any good cause.  It is not mandatory that a specific policy or rule violation be cited to sustain discipline.  This policy is not intended to cover every possible type of misconduct.

**316.5 CAUSES FOR DISCIPLINE**
The following are illustrative of causes for disciplinary action.  This list is not intended to cover every possible type of misconduct and does not preclude the recommendation of disciplinary action for violation of other rules, standards, ethics and specific action or inaction that is detrimental to efficient office service.

. . .

316.5.2 ETHICS

. . .

      (g)    Any other failure to abide by the standards of ethical conduct.

316.5.3 DISCRIMINATION, OPPRESSION, OR FAVORITISM
Unless required by law or policy, discriminating against, oppressing, or providing favoritism to any person because of actual or perceived characteristics such as race, ethnicity, national original, religion, sex, sexual orientation, gender identity or expression, age, disability, economic status, cultural group, veteran status, marital status, and any other classification or status protected by law, or intentionally denying or impeding another in the exercise or enjoyment of any right, privilege, power, or immunity, knowing the conduct is unlawful.

316.5.8 PERFORMANCE

. . .

> (e)    Disparaging remarks or conduct concerning duly constituted authority to the extent that such conduct disrupts the efficiency of this office or subverts the good order, efficiency, and discipline of this office or that would tend to discredit any of its members.

*Id.* at 6-8, 10.

The "Discriminatory Harassment" policy reads, in relevant part:

**313.1 PURPOSE AND SCOPE**
The purpose of this policy is to prevent office members from being subject to discriminatory harassment, including sexual harassment and retaliation. Nothing in this policy is intended to create a legal or employment right or duty that is not created by law.

**313.2 POLICY**
[The BSCO] is an equal opportunity employer and is committed to creating and maintaining a work environment that is free of all forms of discriminatory harassment, including sexual harassment and retaliation. The Office will not tolerate discrimination against a member in hiring, promotion, discharge, compensation, fringe benefits and other privileges of employment. The Office will take preventive and corrective action to address any behavior that violates this policy or the rights and privileges it is designed to protect.

The nondiscrimination policies of the Office may be more comprehensive than state or federal law. Conduct that violates this policy may not violate state or federal law but still could subject a member to discipline.

**313.3 DEFINITIONS**
Definitions related to this policy include:

313.3.1 DISCRIMINATION
The Office prohibits all forms of discrimination, including any employment-related action by a member that adversely affects an applicant or member and is based on actual or perceived race, ethnicity, national origin, religion, sex, sexual orientation, gender identity or expression, age, disability, pregnancy, genetic information, veteran status, marital status, and any other classification or status protected by law.

Discriminatory harassment, including sexual harassment, is verbal or physical conduct that demeans or shows hostility or aversion toward an individual based upon that individual's protected class. It has the effect of interfering with an individual's work performance or creating a hostile or abusive work environment.

Conduct that may, under certain circumstances, constitute discriminatory harassment can include making derogatory comments; making crude and offensive statements or remarks; making slurs or off-color jokes; stereotyping; engaging in

threatening acts; making indecent gestures, pictures, cartoons, posters, or material; making inappropriate physical contact; or using written material or office equipment and/or systems to transmit or receive offensive material, statements, or pictures. Such conduct is contrary to office policy and to a work environment that is free of discrimination.

. . .

313.3.3 SEXUAL HARASSMENT
The Office prohibits all forms of discrimination and discriminatory harassment, including sexual harassment. It is unlawful to harass an applicant or a member because of that person's sex.

Sexual harassment includes but is not limited to unwelcome sexual advances, requests for sexual favors, or other verbal, visual, or physical conduct of a sexual nature when:

. . .

(c)     Such conduct has the purpose or effect of substantially interfering with a member's work performance or creating an intimidating, hostile, or offensive work environment.

. . .

**313.4 RESPONSIBILITIES**
This policy applies to all office members, who shall follow the intent of these guidelines in a manner that reflects office policy, professional standards, and the best interest of the Office and its mission.

Members are encouraged to promptly report any discriminatory, retaliatory, or harassing conduct or known violations of this policy to a supervisor. Any member who is not comfortable with reporting violations of this policy to the member's immediate supervisor may bypass the chain of command and make the report to a higher-ranking supervisor or manager. Complaints may also be filed with the Sheriff, the Director of Human Resources, or the County Administrator.

Any member who believes, in good faith, that the member has been discriminated against, harassed, or subject to retaliation, or who has observed harassment, discrimination, or retaliation, is encouraged to promptly report such conduct in accordance with the procedures set forth in this policy.

Supervisors and managers receiving information regarding alleged violations of this policy shall determine if there is any basis for the allegation and shall proceed with a resolution as stated below.

. . .

313.4.2 SUPERVISOR RESPONSIBILITIES
The responsibilities of supervisors and managers shall include but are not limited to:

(a)     Continually monitoring the work environment and striving to ensure that it is free from all types of unlawful discrimination, including harassment or retaliation.

(b)     Taking prompt, appropriate action within their work units to avoid and minimize the incidence of any form of discrimination, harassment, or retaliation.

(c)     Ensuring that their subordinates understand their responsibilities under this policy.

(d)     Ensuring that members who make complaints or who oppose any unlawful employment practices are protected from retaliation and that such matters are kept confidential to the extent possible.

(e)     Making a timely determination regarding the substance of any allegations based upon all available facts.

(f)     Notifying the Sheriff or the Director of Human Resources in writing of the circumstances surrounding any reported allegations or observed acts of discrimination harassment or retaliation no later than the next business day.

*Id.* at 13-15.

On June 13, 2023, Corporal Dakota Parker ("Cpl. Parker") submitted a formal complaint about a post by Kiel on his Facebook page in which he responded to a post from a local news outlet about a Pride weekend that was held in Fairhope, Alabama. Doc. 18 at 2; Doc. 31-3 at 3. Cpl. Parker included screenshots of Kiel's post as well as the comments to it, one of which was from another officer. Doc. 31-3 at 3. Kiel's original post about the Pride event was a Bible verse, Romans 1:26-27, 32:

For their women exchanged natural relations for those that are contrary to nature, and the men likewise gave up natural relations with women and were consumed with passion for one another, men committing shameless acts with men and

receiving in themselves the due penalty for their error . . . [.] Though they know God's righteous decree that those who practice such things deserve to die, they not only do them but give approval to those who practice them.

Cpl. Parker commented on Kiel's post:

Although you've stated in a fairly public manner that myself and some of your other coworkers deserve to die, I wanted to make sure that you were aware that myself and these other coworkers will selflessly respond (again) when someone who's actually evil attempts to do harm to you (as has happened before).

*Id.* Kiel responded, "I think you both know that I care for both of you greatly. Which is why I want you to come to Christ. If I didn't care about either of you then I would remain silent." *Id.*

The complaint also stated:

While I do not believe that the [ ] post (and other post(s) on his profile) is, in and of itself, in violation of policy number 1021, I do feel that images of Investigator [Kiel] in BCSO uniform posted to his profile that I observed on 6/12/23 do provide the implication that he is representing himself as a member of [the BCSO]. I feel that this inferred relationship could be in violation of MCSO Policy number 1021.

Furthermore, I feel that Investigator [Kiel]'s publicly posted statements can, and will, negatively effect the [BCSO] perception to members of the public at large, as they could be interpreted as violating multiple tenets of the Law Enforcement Code of Ethics.

. . .

Investigator [Kiel] is currently appointed as an Investigator, and thus work intimately with victims of various crimes. His very poignant statement(s) could be considered ripened fruit for civil or criminal litigation if he were ever to pursue charges, neglect to obtain charges, utilize force against, or become a supervisor of a member of the protected class that he has elected to makes these detrimental statements against.

Investigator [Kiel]'s statement has negatively affected the good order and discipline of the [BCSO], which represents itself as non-prejudicial in its execution of law enforcement actions, and as an inclusive family for its employees. His statements have been interpreted by both myself and many of my subordinates as inflammatory towards a protected class. I understand from personal interactions with investigator [Kiel] that his religious beliefs are firmly held, and that his religious expression as well as his right to freedom of speech are protected by the Constitution of the United States; as such, he has every right to those beliefs and speech. I do not agree that he be allowed to make the vitriolic statement listed above while representing

himself as an employee of the [BCSO]. I feel that his decision will have untold second and third order effects if his statement(s) were ever to be obtained by members of the media or public.

*Id.*

On July 12, 2023, Major Tony Nolfe, Assistant Chief Deputy of the BCSO, ("Major Nolfe") composed an email about the complaint against Kiel and sent it to Anthony Lowery and Alainna Elliott ("Elliott"), the BCSO human resources director, in which Nolfe wrote:

Today INV Anthony Kiel and I had a discussion regarding the complaint filed against him. I told him that there was a formal complaint and that we felt it appropriate that I speak with him regarding it. I reiterated that the agency had no intention to censor his off duty free speech and that we believed it to be within policy but that my "warning" or advice to him revolved around the fact that faltering personal relationships could lead to ineffective professional relationships and therefore potentially upon professional performance.

I found his response to be professional and mature. He stated that he had worked with many of our homosexual employees and has friendships with several and those have not faltered. He state[d] he and DEP Anderson have had many fruitful conversations since and both are comfortable with one another. I like one thing he said in particular; he stated that he learned from several MPD officers of Anderson's lifestyle not long after he joined the BCSO and that he never mentioned that to anyone and that it did not prohibit them from being effective squad mates and being very friendly over a long period of time. He also stated that he would never treat any person or Deputy differently than another due to things he may disagree with and that he would expect the same from others due to his beliefs that the knows are not always popular.

I believe the matter is well put to rest and that he and his peers are doing fine.

*Id.* at 6.

On December 4, 2023, Kiel received a performance evaluation for the period between December 5, 2022, and December 4, 2023 ("2023 performance evaluation"), which was completed by his immediate supervisor, Sergeant Michael Walker ("Sgt. Walker"). Doc. 18 at 3; Doc. 31-4. For the evaluation category of "Teamwork", which is described as "[w]illingness to work with others and considers coworkers ideas" and "[a]bility to get along with coworkers and treat them

with respect," Kiel was evaluated to have met expectations, and the evaluator's comment for the

category, which was continued in the "Additional Comments" section of the form, noted:

> Deputy Kiel shows a willingness to work with others to accomplish his assignments. He works well with his fellow investigators and is always willing to lend a hand in their investigations. Deputy Kiel shows the ability to get along with coworkers and treats them with respect. However, Deputy Kiel has strong moral beliefs . . . and is opinionated in this matter. This is not a knock of those beliefs or opinions, that is a fundamental right for everyone to have. The questions [sic] is can you put your personal beliefs and opinions aside when dealing with coworkers that do not hold to the same set of beliefs and opinions. It is my belief that he can and has done so, but I work with him on a daily basis. Other personnel within the Sheriff's Office may only know Deputy Kiel from a comment, opinion, social media post or just plain hearsay, which could lead them not to want to reach out to him for assistance. Deputy Kiel has to find a balance in this area that successfully builds bridges based on trust and open communications.

Doc. 31-4 at 3-4. Kiel signed the evaluation as well as those in his chain of command. *Id.* at 6.

In the "Employees Comments" section of the evaluation, in response to Kiel's evaluation for the

"Teamwork" category, Kiel responded:

> It's worth noting that I consistently extend my availability beyond regular working hours, promptly addressing calls and messages to support colleagues in their tasks. I actively encourage them to reach out whenever necessary. Additionally, I frequently assist the patrol division in their duties when I am near an incident and available. During my off days, I regularly engage in physical training with coworkers at the Ward Room, fostering relationships even among those with differing religious beliefs. Importantly, these interactions have not incited hostility either within or outside the workplace; instead, they have contributed to the cultivation of stronger working relationships. In relation to perceptions formed by colleagues who are not directly involved in my day-to-day activities, I respectfully disagree that any unfavorable opinions, based on incomplete or inaccurate information, should negatively impact my performance assessment. Using such fragmented perspectives as a standard would suggest that anyone encountering a personal disagreement at work would be deemed as underperforming.

*Id.* at 8.

On March 4, 2024, Kiel posted on his Facebook page a video that "featur[ed] comedians,

along with a caption addressing the Nineteenth Amendment to the United States Constitution."

Doc. 18 at 3; *see* Doc. 31-8 at 3. Kiel's added comment to the posted video was "The 19th

amendment should be repealed." Doc. 31-8 at 3.

Inv. Caitlin McSwain ("Inv. McSwain") commented on Kiel's post, "Quick question, I shouldn't have the right to vote? Second question, the United States isn't in inflation with higher taxes because of females and our 'voting rights'. Last I checked we've never had a female president." Doc. 31-7 at 3. Inv. McSwain also commented on the post, "I take full offense to what you've said and I feel I have every right to . . . . Since I'm a women [sic] and all." *Id.* Kiel responded to Inv. McSwain's comment, "Looks like either you've greatly misunderstood something I've said, or someone is feeding you misinformation about me," to which she responded, "No, I formed my opinion all on my own based off your words. Which means other 'women' probably will as well." *Id.* at 5. Inv. Kyle Faldoski ("Inv. Faldoski") added a comment to the post and tagged Inv. McSwain:

> I'm truly sorry that you and all the other females in this world have to face ridicule . . . specifically, something that changed over 100 years ago, and furthermore, within your own division. I hope that one day equality will be a shared and supported belief amongst everyone in this world.

*Id.* at 8. Kiel responded, again, on his post:

> For a group that talks so much about equality, y'all sure are repulsed by different perspectives.
>
> This is the last thing I will say tonight about this because nothing fruitful will come out of this exchange on here. I do not interact with you online; therefore, you had to go out and fish for this information. I haven't said anything to you, and you have no ability to see what I post online without going through another person. You chose to seek this out and get offended.
>
> You do not know what I believe. You think you do, but you don't. If you really wanted to know what I think, you would ask for clarification. But you didn't. I'll give you a hint though: you read this one wrong.

*Id.* at 9-11.

On March 5, 2024, Lt. Andrew Ashton ("Lt. Ashton") was made aware by Deputy Sydney

Wentworth ("Deputy Wentworth) of Kiel's post about the Nineteenth Amendment.  Doc. 31-5 at

10.  Lt. Ashton noted in his report "March is National Women's Month, and the 5th was a voting

day for our county."  *Id.* at 10.  Lt. Ashton described Kiel's post:

> The post had an attached video clip from a podcast where the two male hosts and a
> female guest were making the argument that women and Black Democrat voters
> were the reason for the current state of our county and that women indeed should
> not have the right to vote based on this ideology.

*Id.*

Lt. Ashton's report described the negative responses to Kiel's post from multiple members

of the BCSO.  Deputy Wentworth was "visibly upset and set back by what she believed to be sexist

and misogynistic comments" that Kiel posted.  *Id.*  Cheryl Vaugh, an administrative assistant,

stated Kiel was "insensitive to the gay community and obviously to 'women in general'" and his

comments "would also cause females within the agency to feel unsupported, untrusted, and

devalued" by him.  *Id.*  Cassy Linville ("CSI Linville"), a crime scene investigator, said "she was

put off by [Kiel's] comments and they made her cringe" and "she had become accustomed to

hearing things of this nature from [him] though, so it did not surprise her that he had made

comments such as this."  *Id.*  CSI Linville said "as a female who works in an all-female crime

scene group, she did not trust, feel valued, or believe that [Kiel] had either her or her partner's

back based on his disrespectful comments."  *Id.*  CSI Keeley Bynum said "she was put off by the

fact that someone at the agency looked down on her because of gender or sex" and said "it would

be hard to trust [Kiel] moving forward as he did not see her as an equal."  *Id.*  Inv. McSwain sent

an email to Lt. Ashton and Capt. Reid that read:

> [Kiel's] statement alongside what the main points of the video were meant to
> construe, left me, a female, and fellow deputy, feeling as though he believes I and
> other women shouldn't be allowed to vote.  If women are not allowed to vote, hold
> opinions, or be able to take actions that could affect the general population then per
> his argument, women shouldn't be working in law enforcement.  In our line of work,

we should never have to question if the person we are going out on a call with trusts us with their life.  But statements like the one recently shared impact not only [Kiel's] fellow sisters in law enforcement, but they have the potential to impact any future cases he may brin against a female he charges/arrests.

By posting that on a forum in which he has numerous contacts who work side by side with him in law enforcement, I believe [Kiel] has made it clear he is not comfortable with women who hold positions such as the one I and many other women do and I would ask that anyone in his position be reviewed for conduct and how their personal opinions may weigh in on their professional effectiveness.

*Id.* at 10-11.  Inv. Faldoski said "he was very upset by not only how [Kiel] spoke of women, but other social groups as well," "[h]e felt that this type of speech was detrimental to the command and the public trust that . . . Law Enforcement Officers hold in the community," and "[t]his way of thinking has no place in a job where impartiality is key and expected."  *Id.* at 11.  CSI Katie Mooney ("CSI Mooney") said "[n]ot only was she affected by the posts from the previous year, but she was affected this year as a woman as well," "there was no real surprise from her regarding the most current posts on Facebook," and "[s]he was equally offended by [Kiel's] current post but knew that with his track record, it was a matter of time before he showed who he truly was once again."  *Id.*  CSI Mooney said "as a female crime scene Investigator[,] she had lost all trust for Kiel and knew that she could not depend on him to do right by her based on how he felt about women" and "[s]he worried for the newer members of the agency and her unit and how this would affect them, as like her she never expected this type of behavior from a Deputy or Cop."  *Id.*  CSI Mooney asked, "How can you be trusted to enforce the law when you look at women and the gay community as secondhand citizens who are below you?"  *Id.*

Based on Kiel's post about the Nineteenth Amendment and the complaints that were voiced to Lt. Ashton, he concluded:

It appears that [Kiel] has failed in some aspects of the Law Enforcement Code of Ethics by allowing his personal feelings and prejudices to color his outlook toward women as lesser citizens to men.  This is in direct conflict with being a symbol of

Page 14 of 37

public trust and could possibly discredit this agency.  [Kiel] Also appears to have possibly violated **Policy 1021.4 subsections (b) and (c)**.

. . .

There is also a possible violation of **Policy 316.5.3 Discrimination, Oppression, or Favoritism**[.]

*Id.* at 12-13 (emphasis in original).

On March 6, 2024, Sgt. Walker, along with Corporal Richerson ("Cpl. Richerson"), met with Kiel in Sgt. Walker's office to discuss Kiel's Facebook post about the Nineteenth Amendment. Doc. 31-5 at 2.  "The meeting was intended to discuss how perceptions could be made by his co-workers within the Investigation Unit, other [BCSO] personnel, and the public." *Id.*  Sgt. Walker asked Kiel what he believed the post would accomplish to which Kiel responded it was his "personal and religious beliefs and represent his way of life." *Id.*  Sgt. Walker then asked Kiel what he felt about how others would perceive his post to which Kiel responded "'he did not care what they thought[,]' it was his personal belief, and he did not have to justify it to anyone." *Id.*  Sgt. Walker then asked Kiel how his co-workers would perceive his post to which Kiel responded "I don't care what they think, it's a private post of my personal opinion." *Id.*  Sgt. Walker informed Kiel the post was not private since people with whom he was not friends with on Facebook viewed the post. *Id.*  Sgt. Walker then asked Kiel how females within the BCSO criminal investigation unit would perceive his post to which he responded "he did not care about their thoughts or feelings, and it was his First Amendment right to free speech." *Id.*  Kiel told Sgt. Walker he was a Christ, first, and a deputy, second. *Id.*  Sgt. Walker cautioned Kiel his "delivery method without backing in a religious nature could be perceived in an unfavorable light." *Id.*  Sgt. Walker "advised [Kiel] that the people that could be offend [sic] by his statement probably perceived him as a 'bible thumping asshole' and would never ask him to explain his belief." *Id.*  At this point in the

conversation, "it was an intense discussion and there were times where voices were raised." *Id.*

Sgt. Walker tried to re-engage Kiel about how other members of the BCSO could perceive his post, but Sgt. Walker determined "[i]t was clear by this point that no matter what I asked or how I attempted to get [Kiel] to understand that others could take his statement and the video as offensive, that he did not care." *Id.* at 2-3. Sgt. Walker then ended the discussion with Kiel and asked him to leave after which he contacted Elliot, the human resources director, for guidance. *Id.* at 3.

After Kiel's meeting with Sgt. Walker and Cpl. Richerson and on the same day, he emailed Elliott to inquire whether he could schedule a time with her to discuss how he felt he was "targeted because of [his] speech and would like some clarification on the issue." *Id.* at 8. Kiel explained to Elliott the situation was caused by "two Facebook posts that I made on my personal account during personal time." *Id.* at 8. "One was several months ago and was a quote from the Bible. [Kiel] was talked to about that post and also received a penalty on [his] annual evaluation because of it." *Id.*

> The second one is from a couple of day ago regarding a vide on the 19th amendment. [Kiel] shared the post in agreement with the video that was attached. It's a topic that [he has] theological convictions about, and it was shared during personal time. Today, my supervisor spoke to me at length about it, called me a "Bible-thumping asshole[."] yelled at me, and told me to "go be a f***ing preacher if you want to be a f***ing preacher[."]. I was also informed that I will likely have to meet with the lieutenant about the post, although I was told today that I didn't violate any policy. I'm sure the meeting, if it happens, will be a repeat of today where I am required to defend my religious convictions.

*Id.*

On March 7, 2024, Sgt. Walker, along with Cpl. Richerson, met with Kiel in Sgt. Walker's office to discuss certain topics, the first of which was "[h]ow the conversation from the day before about the social media post and video was considered over." *Id.* at 4. As to that topic, Sgt. Walker

stated he had not further thoughts and asked them if they anything they would like to say about it to which Cpl. Richerson and Kiel agreed there was nothing to add to the discussion. *Id.* Another topic was "[h]ow [Sgt. Walker] thought the lines of supervision may have been blurred by [him] being too open with them and to expect possible changes," to which Cpl. Richerson and Kiel advised they understood. *Id.* The last topic was how Sgt. Walker could be a better leader "[w]ithin the past year and past couple of days," and Sgt. Walker encouraged Cpl. Richerson and Kiel to respond without fear of repercussions. *Id.* Cpl. Richerson said he did not have an issue with Sgt. Walker's leadership, and Kiel said "he would not change anything" and "loved working for [Sgt. Walker" after which the meeting was concluded. *Id.*

Also on March 7, 2024, Deputy Andrew Anderson ("Deputy Anderson") filed a formal complaint about Kiel's Facebook posts and attached screenshots of Kiel's posts. Doc. 31-8 at 2-23. Deputy Anderson stated Kiel, through his Facebook posts, "demonstrated an explicit bias towards women and the LGBT community, through numerous anti LGBT and misogynistic posts." *Id.* Deputy Anderson described some of the posts "advocat[ed] for the repeal of the 19th amendment, express[ed] support for Uganda's criminalization of homosexuality, and endors[ed] the death penalty when it applies to killing 'human beings who violate the law of God,'" and "indicat[ed] a willingness to prioritize his personal beliefs over professional obligations, labeling individuals with differing worldviews as enemies of his faith." *Id.* Deputy Anderson stated:

> [Kiel's] biases foster distrust among his fellow deputies at the [BCSO]. Law enforcement relies on mutual respect and collaboration among team members for effective operations. However, [Kiel's] divisive rhetoric, particularly towards marginalized groups, undermines the trust and cohesion necessary for professional teamwork. It's crucial that all members uphold principles of fairness and respect to maintain a supportive and inclusive work environment.
>
> This behavior also raises significant concerns about [Kiel's] ability to fulfill his duties impartially and in accordance with the policies and values of the [BCSO]. BCSO policy #401.2 states "The [BCSO] is committed to providing law

enforcement services to the community with due regard for the racial, cultural or other differences of those served.  It is the policy of this office to provide law enforcement services and to enforce the law equally, fairly, objectively and without discrimination toward any individual or group."

Furthermore, [Kiel's] outwardly expressed biases and identification of individuals with differing worldviews as enemies undermine public trust in law enforcement and may compromise the integrity of routine criminal proceedings and lethal force investigations involving [Kiel].

In light of the foregoing, I request that a thorough internal investigation be conducted into [Kiel's] social media activity and its potential impact on his ability to perform his duties effectively and impartially.

*Id.*

Per an affidavit by Elliott, on the same date, Sheriff Lowery (at the time, the chief deputy), and Elliott met with Kiel and Sherriff Lowery explained to Kiel his social media posts harmed his relationships with his coworkers and could harm the public's perception of him as well as the BCSO.  Doc. 31-6 at 4.  Kiel then "insisted he had the absolute right to express his beliefs however he wanted" and "explained at length that he did not believe that women should be in a position of authority and belonged primarily in the home."  *Id.*  Kiel disputes this characterization of what he said at the meeting.  Doc. 37 at 3, 4.  Elliott then asked Kiel if he thought she should have her position to which he responded, "Well, that's not what I'm saying," then "continued to explain to [Elliott] the undue stress and negative consequences placed on families when women work outside the home."  Doc. 31-6 at 4.

On March 8, 2024, Lt. Ashton completed an investigation and administrative analysis of Kiel's actions, and based on the analysis and Kiel's statement, his supervisors determined he violated multiple policies, his relationships with his co-workers had been irreparably harmed, there was concern his statements during the investigation showed it was difficult for him to separate his personal beliefs from his professional duties, and his statements "would likely cause a perception

of bias that could discredit any future investigations in which he was specifically involved –

possibly to the point of requiring disclosure under *Giglio v. United States* – and hurt the public's

trust in the [BCSO] in general." *Id.* at 4-5.  Kiel was issued a "Notice Of Pre-Disciplinary Hearing"

that was dated March 12, 2024, from Lt. Ashton in which Kiel was notified a hearing was

scheduled for March 15, 2024, at which he would be allowed the opportunity to address the policy

violations that were listed in the notice.  Doc. 31-5 at 14.  The notice listed the BCSO policies that

were allegedly violated, "Policy 1021 (Speech, Expression and Social Networking)" and "Policy

313 (Discriminatory Harassment)."  *Id.*  In an email that is dated March 14, 2024, Major Nolfe

informed Kiel the alleged BCSO policy violations in the notice were amended to include:

> 316.5.8(e) – Disparaging remarks or conduct concerning duly constituted authority
> to the extent that such conduct disrupts the efficiency of this office or subverts the
> good order, efficiency, and discipline of this office or that would tend to discredit
> any of its members.
> 316.5.8(i) – Any act on- or off-duty that brings discredit to this office.
> 316.5.9(f) – Discourteous, disrespectful or discriminatory treatment of any member
> of the public or any member of this office or the County.
> 316.5.9(g) – Criminal, dishonest or disgraceful conduct, whether on- or off-duty,
> that adversely affects the member's relationship with this office.
> 316.5.9(l) – Any other on- or off-duty conduct which any member knows or
> reasonably should know is unbecoming a member of this office, is contrary to good
> order, efficiency or morale, or tends to reflect unfavorably upon this office or its
> members.
> 1021.4(b) – Speech or expression that, while not made pursuant to an official duty,
> is significantly linked to or related to, the Office and tends to compromise or
> damage the mission, function, reputation or professionalism or the Office or its
> members.
> 1021.4(c) – Speech or expression that could reasonably be foreseen as having a
> negative impact on the credibility of the member as a witness.  For example, posting
> to a website statements or expressions that glorify or endorse dishonesty, unlawful
> discrimination or illegal behavior.

*Id.* at 15.

On March 19, 2024, Kiel was notified he would be terminated, but he chose to resign in

lieu of termination.  Doc. 31-6 at 5.  If Kiel was terminated, he would have had the opportunity to

appeal the decision the sheriff, the personnel appeals board, and, ultimately, the Circuit Court of Baldwin County. *Id.*

In response to a written interrogatory to Kiel for him to identify persons who were similarly situated to him who committed the same or similar breaches of BCSO policy but were treated more favorably than him, he wrote:

> Plaintiff believes Lt. Andy Ashton was given the benefit of preferential treatment when he stated that those opposing diversity, equity, and inclusion policies are "racist." Lt. Ashton stated that any such individuals were "political idiots" or "ignorant idiots" and "good old fashioned racists." Plaintiff believes these statements were made in the context of states such as Alabama and Florida pushing to outlaw diversity equity and inclusion policies in the workplace. He was not disciplined.

> Plaintiff also believes Kyle Faldoski was treated more favorably when he sent co-workers a flyer for a drag show in Foley, Alabama and mockingly asked who was coming with him, as well as when he mockingly stated "insert your preferred gender" in references so [sic] a Pensacon flyer. Kyle Faldoski also stated that "[m]ore than half of the Alabama lawmakers sleep with their 13-year-old cousins after church on a Sunday." He was not disciplined.

> Plaintiff also believes David Aldrete was treated more favorably. He stated that everyone should not "forget to exercise [their] God-given rights today," to which Nate Lamplugh claimed said rights were "[e]arned, David. They were earned." Neither were disciplined.

> Former Sheriff Mack was also treated more favorably. He alleged President Biden was "America's greatest socialist." He was not disciplined for this, nor when he endorsed Representative Jerry Carl for public office. Former Sheriff Mack also posted a picture on social media of a man visibly wearing makeup in front of a rainbow flag with the caption "New boy scout uniform revealed." He was not disciplined.

> Deputy Tyrone Thompson was treated more favorably. He attended a Roy Moore rally at Oak Hallow [sic] Farm in Fairhope while off-duty. He was protesting at the rally and escorted away by uniformed deputies for being unruly, including Deputy Tyler Ludke. He was not disciplined despite media coverage of the same.

> Major Tony Nolfe was treated more favorably. He responded to a social media post stating "I like my brownies like I like my women . . . no nuts." Major Nolfe reacted in laughter to the post, along with at least two other employees of Defendant who Plaintiff is unable to recall at this time. None were disciplined for mocking

Page 20 of 37

transgender individuals.  Major Nolfe also posted on social media that Democrats are "unserious, intellectually dishonest, or just stupid."  Just beneath said post, he shared something linking himself to employment with Defendant.  He was not disciplined.  Major Nolfe also posted a comment on social media regarding transgender individuals, claiming that "[o]ur liberals quake over fake women being subjected to pronouns they don't like or having their feelings hurt."  He was not disciplined.  Major Nolfe was tagged in a social media post addressing new ATF rules, where the author exclaimed that the rules constituted "[m]ore illegal ATF overreach!"  He was not disciplined.  Major Nolfe also like comments on a social media post regarding the LGBTQ community which stated that those who disagree with such a lifestyle are told they are "bad and awful people" and "today's [sic?] tries to force feed us into accepting what we know is immoral."  He was not disciplined.

Doc. 31-9 at 16-19

## B.    Procedural Background

Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and timely filed this action after he received a right-to-sue letter from the EEOC.  Doc. 18 at 2.

The complaint in this matter was originally filed by Plaintiff with this Court on August 29, 2024, in which he brought claims pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 ("Title VII"), as well as the First and Fourteenth Amendments and 42 U.S.C. § 1983, against Defendants Baldwin County, Alabama ("Baldwin County") and Huey Mack ("Mack"), the Sheriff of Baldwin County.  Doc. 1 at 1.

On September 25, 2024, Baldwin County and Mack filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and/or 12(b)(6).  Doc. 5 at 1.  On October 17, 2024, Plaintiff filed a first amended complaint (Doc. 9), which the Court allowed pursuant to Fed. R. Civ. P. 15(a)(2), so the first amended complaint became the operative complaint and the motion to dismiss was denied as moot (Doc. 11).  The first amended complaint removed Baldwin County as a defendant and added Sheriff Lowery as a defendant.  Doc. 9 at 1-2.

On October 23, 2024, the defendants filed a motion to strike Mack, in his official capacity Sheriff of Baldwin County because Mack retired from his position as sheriff on August 31, 2024, to assume a new position that was appointed by the Governor of Alabama. Doc. 12 at 1. On the same date, Sheriff Lowery filed an answer to the first amended complaint. Doc. 13. The Court entered an Order for Plaintiff to show cause why the motion to strike should not be granted (Doc. 11) to which Plaintiff responded he did not oppose the relief that was requested in the motion to strike and, in turn, requested the Court grant him leave to file a second amended complaint (Doc. 12), which was attached to the response (Doc. 12-1). Sheriff Lowery filed a reply to the Order to show cause in which he stated he did not oppose the proposed second amended complaint. Doc. 15. The Court construed Plaintiff's response to the Order to show cause as a motion to amend and granted the motion. Doc. 17.

On November 19, 2024, Plaintiff filed a second amended complaint in which he brings two claims against Sheriff Lowery for (Count 1) religious discrimination in violation of Title VII and (Count 2) retaliation in violation of Title VII. Doc. 18. On December 3, 2024, Sheriff Lowery filed an answer to the second amended complaint. Doc. 19.

On December 8, 2025, Sheriff Lowery filed the instant motion for summary judgment (Doc. 32) and evidentiary materials in support of the motion (Doc. 31) to which Plaintiff timely filed his response (Doc. 37) and evidentiary material in support of the response (Doc. 36), and Plaintiff his reply (Doc. 40). The motion for summary judgment is fully briefed and ripe for review, and the Court finds oral argument is unnecessary to resolve the issues that are presented in the motion.

### III.    STANDARD OF REVIEW

A party in a lawsuit may move a court to enter summary judgment before trial. FED. R. CIV. P. 56(a), (b). Summary judgment is appropriate when the moving party establishes there is

no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ritchey v. S. Nuclear Operating Co.,* 423 F. App'x 955 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248).[2] At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Only disputes about the material facts will preclude the granting of summary judgment. *Id*.

The movant bears the initial burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). The admissibility of evidence is subject to the same standards and rules that govern admissibility of evidence at trial. *Clemons v. Dougherty County*, 684 F.2d 1365,

---

[2] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)).

Once the movant meets its burden under Fed. R. Civ. P. 56, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)); *Greenberg*, 498 F.3d at 1265 ("We view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion."). However, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted). Conclusory assertions, unsupported by specific facts, that are presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "Speculation does not create a *genuine* issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50 (emphasis in original) (citations omitted). In short, summary judgment is proper after adequate time for discovery and upon motion against a party who fails to make a showing that is sufficient to establish the existence of an element that is essential to that party's case. *Celotex*, 477 U.S. at 322.

Finally, Fed. R. Civ. P. 56(e) also provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order."  FED. R. CIV. P. 56(e).

## IV.    DISCUSSION AND ANALYSIS

Defendant makes several arguments in support of his motion for summary judgment: (1) Plaintiff failed to exhaust all of his administrative remedies because he did not obtain a notice of right to sue from the Attorney General as required by 42 U.S.C. § 2000e-5(f)(1) for suits that are brought against "a government, governmental agency, or political subdivision;" (2) Plaintiff cannot support a prima facie case of religious discrimination because he cannot identify any similarly situated employees who were outside of his class and were treated more favorably to establish a causal link between his adverse action and his protected class and the statements that Plaintiff identifies are not of similarly severe as his; (3) Plaintiff cannot support a prima facie case of retaliation, specifically a temporal connection between the protected activity and the adverse activity, because Plaintiff's complaint to the human resources was about the investigation into his behavior that led to the decision to initiate termination proceedings against him; (4) Plaintiff's retaliation claim for failure to rehire is not based on a discrete act of discrimination that is separate from his original charge of discriminatory discharge; and (5) termination proceedings were initiated for a legitimate, non-discriminatory reason-Plaintiff's behavior caused serious damage to his working relationships and the public trust.  Doc. 32 at 12-25.

In response to Defendant's first argument, Plaintiff argues the Supreme Court has held the requirement to file a timely charge of discrimination and obtain a right-to sue letter is not jurisdictional and functions as a statute of limitations that is subject to waiver, estoppel, and equitable tolling, which has also been recognized by the Eleventh Circuit.  Doc. 37 at 8-11. Plaintiff argues he timely filed a charge of discrimination with the EEOC, received a right-to-sue letter, and then timely filed this action.  *Id.* at 10.  Plaintiff argues the right-to-sue letter did not state he was also required to receive a right-to-sue letter from the Attorney General and Defendant is not prejudiced because Plaintiff did not receive a right-to-sue letter from the Attorney General since Defendant had notice of the instant claims.  *Id.*

Plaintiff argues he can show direct evidence of religious discrimination.  *Id.* at 11-14. Plaintiff argues his supervisor, Sgt. Walker, stated explicit, derogatory comments about Plaintiff's religious beliefs when he referred to Plaintiff as a "Bible-thumping asshole" and said Plaintiff should "go be a fucking preacher if [he] wants to be a fucking preacher."  *Id.* at 13.

Further, Plaintiff argues, even if he cannot identify a similarly situated comparator to satisfy the *McDonnell Douglas Corp.* [*v. Green*, 411 U.S. 792 (1973),] framework, he has produced sufficient circumstantial evidence to show a convincing mosaic to prove Defendant discriminated against him: (1) the disparaging remarks by Sgt. Walker, (2) Plaintiff was told his June 2023 post did not violate departmental policy, (3) Plaintiff was retroactively punished for his July 2023 post in his 2023 performance evaluation, (4) the abbreviated timing between when Sgt. Walker said his disparaging remarks and when disciplinary proceedings were scheduled against Plaintiff, and (5) similarly situated employees were treated better than Plaintiff.  *Id.* at 14-16. Defendant argues the same circumstantial evidence that shows a convincing mosaic of a discriminatory act also shows Defendant's reason to initiate disciplinary proceedings against

Plaintiff was pretextual.  *Id.* at 16-17.

Lastly, as to Plaintiff's retaliation claim, he argues he has established a prima facie case because Defendant concedes, for purposes of summary judgment, Plaintiff's actions on March 6, 2024, are protected activity and he suffered an adverse employment action, as well as the close temporal proximity between the protected activity and the adverse employment action.  *Id.* at 17-18. 1

In reply, Defendant concedes Plaintiff has shown he is entitled to equitable modification of the statutory requirement to obtain a right-to-sue letter from the Attorney General based on Plaintiff's assertion he relied on the right-to-sue letter that was issued by the EEOC.  Doc. 40 at 1 n.1.

As to Plaintiff's direct evidence of discrimination, Defendant argues in reply Sgt. Walker's comments to Plaintiff are not direct evidence because Sgt. Walker was not a decisionmaker-the person who fired, demoted, or punished the plaintiff-and it was Lt. Ashton and Major Nolfe who proposed Plaintiff be terminated.  *Id.* at 4-5.  Further, Plaintiff argues Sgt. Walker's comments do not meet the high standard for direct evidence and he did not pair his comments with any disciplinary action.  *Id.* at 5-6.

As to Plaintiff's convincing mosaic argument, Defendant argues in reply the timing of Sgt. Walker's comments about Plaintiff and the initiations of termination proceedings against Plaintiff can be attributed to the coworker complaints about Plaintiff's March 4, 2024 post rather than a sudden discriminatory impulse.  *Id.* at 7.  Defendant argues Plaintiff was previously counseled about the effects of his social media posts on his personal relationships with coworkers after complaints were voiced against his June 2023 post, which was deemed to not violate BSCO policy, and Plaintiff's argument that he was retroactively punished for the post in his annual evaluation is

without merit.  *Id.* at 8.  Defendant argues Plaintiff has not properly shown the statements of the similarly situated employees that he identifies are not their closely held religious beliefs to prove they were outside of his protected class but, even if Plaintiff did show such, there is a substantive difference between Plaintiffs March 4, 2024 post and the statements he identifies.  *Id.* at 9-11. Defendant also argues Plaintiff's March 4, 2024 post was intentionally posted during International Women's Month and one day prior to a primary election and has not shown the comments of the similarly situated employees who he identified shared such conspicuous timing.  *Id.* at 11. Defendant argues Plaintiff does not dispute his coworkers' reactions to his posts and has not shown similar negative reactions to the comments of the similarly situated employees who he identified. *Id.* at 11-12.

Finally, as to Plaintiff's retaliation claim, Defendant argues in reply the investigation of Plaintiff's conduct began before he emailed Elliott to complain he would likely need to meet with the lieutenant about his position.  *Id.* at 13-14.

The Court will first address Plaintiff's religious discrimination claim then his retaliation claim.

### A.   Religious Discrimination

Under Title VII, it is unlawful for an employer: (1) "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" or (2) "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" because of such individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1)-(2).   A Title VII plaintiff can prove intentional discrimination through direct or

circumstantial evidence.  *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010).

Here, Plaintiff argues he has presented direct evidence of religious discrimination and, alternatively, sufficient circumstantial evidence that creates a triable issue of Defendant's discriminatory intent.  The Court will address these arguments, in turn.

### a.      Direct Evidence

"Direct evidence of discrimination is 'evidence which reflects a discriminatory . . . attitude correlating to the discrimination . . . complained of by the employee.'"  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1357 (11th Cir. 1999)).  Direct evidence is "evidence that, if believed, proves [the] existence of [a] fact without inference or presumption."  *Id.* (quoting *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997)).  "'[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of' some impermissible factor constitute direct evidence of discrimination."  *Id.* (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002)).

> [R]emarks that are not tied to a challenged employment decision or are made by non-decisionmakers do not qualify under [the Eleventh Circuit's] definition of direct evidence of discrimination.  *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002); *Cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) (O'Conner, J., concurring in judgment) (finding that "stray remarks in the workplace" or statements by non-decisionmakers, or statements by decisionmakers unrelated to the decision process" cannot justify shifting the burden to the employer to show that its decisions are legitimate).

*Robertson v. Riverstone Cmtys., LLC*, 849. F. App'x 795, 801 (11th Cir. 2021).

To determine whether conduct is direct evidence of discrimination, the Eleventh Circuit has considered such factors as whether the alleged discriminator was a plaintiff's supervisor, whether the alleged discriminator was a plaintiff's sole supervisor, whether the discriminatory

Page 29 of 37

statements are related to the employment decision, the temporal proximity of the statements to the employment decision, and the frequency of discriminatory statements. *See Scott*, 295 F.3d at 1227-28 (concluding supervisor's comment, "We'll burn his black ass," which was made after the supervisor filled in for the plaintiff while he was on jury duty and more than one year before the plaintiff was terminated, "was simply too far removed and too indirectly connected to the termination decision to constitute direct evidence of discrimination under the law of this circuit"); *Haynes v. W.C. Caye & Co.*, 52 F.3d 928, 930-31 (11th Cir. 1995) (concluding the company president's statement that women are "not competent enough" to perform a job that the plaintiff desired, and was denied, was direct evidence of discrimination); *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1071 n.9 (11th Cir. 1990) (holding "[d]iscriminatory motive may be proved by direct evidence of the hiring authority's racially discriminatory attitudes, regardless of whether it relates to the employment decision at issue" where the "flagrant, revolting, and insulting racially derogatory remarks towards and in the presence" of black employees by the hiring decisionmaker and other managers for the defendant company created a racially hostile environment); *Burns v. Gadsden State Cmty. Coll.*, 908 F.2d 1512, 1518 (11th Cir. 1990) (holding a college president's statement, "[N]o woman should be named" to a position that plaintiff desired, and was denied, was direct evidence of discrimination); *Buckley v. Hosp. Corp. of Am.*, 758 F.2d 1525, 1527-28, 1530 (11th Cir. 1985) (concluding the sole decisionmaker's statements that he was surprised at the longevity of the staff members, wanted "new blood," intended to recruit "younger doctors and nurses," and commented on plaintiff's "advanced age" were direct evidence of discrimination, even though some of the statements were made more than one-year prior to the employment decision, were direct evidence of discrimination).

Here, Plaintiff's direct evidence of discrimination includes Sgt. Walker's March 6, 2024,

comments to Plaintiff he was a "Bible-thumping asshole" and for him to "go be a fucking preacher if [he] wants to be a fucking preacher." Doc. 37 at 13. Sgt. Walker was Plaintiff's immediate supervisor, but the decision to initiate disciplinary proceedings against Plaintiff was by Lt. Ashton, who wrote a report of the numerous complaints by members of the BCSO about Plaintiff's March 4, 2024 post and issued the "Notice Of Pre-Disciplinary Hearing," and Major Nolfe, who amended the notice to include additional alleged policy violations. Based on the reports of the March 6, 2024 meeting between Sgt. Walker, Cpl. Richerson, and Plaintiff, Sgt. Walker's comments were related to his attempt to counsel Plaintiff about the negative effects to his working relationships with his coworkers from his social media posts. Lt. Ashton's report shows the decision to initiate disciplinary proceedings against Plaintiff was based on numerous complaints from members of the BCSO about his March 4, 2024 post and the policies it violated. Ultimately, Plaintiff has not shown either Sgt. Walker's comments were related to the decision to initiate the disciplinary process against Plaintiff or Sgt. Walker was a decisionmaker who initiated the disciplinary process against Plaintiff. Therefore, Sgt. Walker's comments to Plaintiff are not direct evidence of religious discrimination against Plaintiff.

### b.    Convincing Mosaic

[A]n employee can still survive summary judgment by presenting "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted). A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) "systematically better treatment of similarly situated employees," and (3) pretext. *Lewis* [*v. City of Union City*], 934 F.3d [1169,] 1185 [(11th Cir. 2019)].

*Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022).  "[N]o matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper."  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

Plaintiff states he was punished in his 2023 performance evaluation because of his June 2023 post, which was determined to not violate BCSO by Major Nolfe.  Doc. 31-3 at 6; Doc. 37 at 15.  Despite Major Nolfe's determination, he counseled Plaintiff about "faltering personal relationships [that] could lead to ineffective professional relationships and therefore potentially upon professional performance," a concern that was reflected in Plaintiff's 2023 performance evaluation.  Doc. 31-3 at 6; Doc. 31-4 at 3-4.  Specifically, Sgt. Walker noted in the 2023 performance evaluation:

> The questions [sic] is can you put your personal beliefs and opinions aside when dealing with coworkers that do not hold to the same set of belief s and opinions.  It is my belief that he can and has done so, but I work with him on a daily basis.  Other personnel within the Sheriff's Office may only know Deputy Kiel from a comment, opinion, social media post or just plain hearsay, which could lead them not to want to reach out to him for assistance.  Deputy Kiel has to find a balance in this area that successfully build bridges based on trust and open communications.

Doc. 31-4 at 3-4.

As to Sgt. Walker's comments to Plaintiff during the March 6, 2024 meeting that were stated shortly before disciplinary proceedings were held for Plaintiff, Sgt. Walker's stated purpose for the meeting was to address the numerous complaints by BCSO personnel about Plaintiff's March 4, 2024 post and discuss how his posts could affect the perception of him, by his coworkers at the BCSO and the public, as someone who was inconsiderate to the feelings of others.  Doc. 31-5 at 2-3.  However, Plaintiff made it clear to Sgt. Walker he did not care what others thought about his post and he was a "Christian first and a Deputy second."  *Id.* at 2.  Plaintiff rationalized his

March 4, 2024 post, which did not contain a religious reference, as his deeply held religious belief and did not require him to change said belief. *Id.* Plaintiff made it clear he did not intend to change others' perception of him, any offense that was felt by others was not his concern, and he had a right to express his beliefs, regardless. *Id.* As the Court noted, Sgt. Walker was Plaintiff's immediate supervisor and the decision to initiate disciplinary proceedings against Plaintiff was by Lt. Ashton and Major Nolfe.

As to the instances of systematically better treatment of similarly situated employees that Plaintiff identified, he must show the comparators were "similarly situated in all material respects." *Lewis v. City of Union City*, 918 F.3d 1213, 1226 (11th Cir. 2019). The Eleventh Circuit explained what is meant by "similarly situated in all material respects:"

> We know, for instance, that the plaintiff and her comparators need not be "similar in all but the protected ways." *Young* [*v. United Parcel Serv., Inc.*], 135 S. Ct. [1338,] 1354 [(2015)]. A plaintiff needn't prove, therefore, that she and her comparators are identical save for their race or gender, as the case may be. Not even the nearly-identical standard requires that level of exactitude. Nor is it necessary for a plaintiff to prove purely formal similarities—e.g., that she and her comparators had precisely the same title. *See Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) ("The relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies.") (citation omitted). Nor will minor differences in job function disqualify a would-be comparator. *See, e.g., Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998) (concluding that minor "differences in . . . job activities" did not "automatically" disqualify plaintiff's proffered comparators, at least where they held "related human resources positions").
>
> Having said that, we can also envision the sorts of similarities that will, in the main, underlie a valid comparison. Ordinarily, for instance, a similarly situated comparator—
>
> • will have engaged in the same basic conduct (or misconduct) as the plaintiff, *see, e.g., Mitchell v. Toledo Hosp.*, 964 F.2d 577, 580, 583 (6th Cir. 1992) (holding that a plaintiff terminated for "misuse of [an employer's] property" could not rely on comparators allegedly guilty of "absenteeism" and "insubordination");

- will have been subject to the same employment policy, guideline, or rule as the plaintiff, *see, e.g., Lathem*, 172 F.3d at 793 (holding that a plaintiff's proffered comparators were valid where all were subject to the same "workplace rules or policies");

- will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff, *see, e.g., Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) (observing that "disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis"); and

- will share the plaintiff's employment or disciplinary history, *see, e.g., Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016) (explaining that "[d]ifferences in experience and disciplinary history" can disqualify a plaintiff's proffered comparators).

In short, as its label indicates–"all material respects"–a valid comparison will turn not on formal labels, but rather on substantive likenesses. To borrow phrasing from a recent Supreme Court decision, a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they "cannot reasonably be distinguished." *Young*, 135 S. Ct. at 1355.

*Id.* at 1227-28.

Here, Plaintiff has not shown that the conduct of his comparators was the subject of multiple complaints from coworkers that did not result in disciplinary action, as occurred with him. *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1312 (11th Cir. 2023) (distinguishing the plaintiff's identified comparators because they were not "the subject of multiple reports that they were unprofessional, threatening, intimidating, and abusive" like the plaintiff).

Finally, as to pretext:

A plaintiff can show pretext by: (i) casting sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct, (ii) showing that the employer's articulated reason is false and that the false reason hid discrimination, or (iii) establishing that the employer has failed to clearly articulate and follow its formal policies.

*Lewis v. City of Union City*, 934 F.3d 1169, 1186 (11th Cir. 2019) (citation omitted).

Here, the evidence submitted to the Court shows documented complaints, official and unofficial, by BCSO personnel against Plaintiff for his social media posts and efforts by his supervisors to counsel him about the effects of his social media posts on his working relationships with his co-workers as well as his intransigence to consider those who might be affected by his posts.

Ultimately, viewing the evidence in the light most favorable to Plaintiff, the Court finds Plaintiff has not presented a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.

Accordingly, summary judgment is due to be **GRANTED** as to Plaintiff's religious discrimination claim.

## B.   Retaliation

Section 704(a) of the Civil Rights Act states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by . . . [Title VII] or because he has made a change, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

To establish a prima facie retaliation claim under Title VII, a plaintiff must show "(1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (citations omitted).

Plaintiff alleges he was terminated within approximately two weeks after he reported Sgt. Walker's comments about him to Elliott.  Doc. 18 at 7.  Sgt. Walker's comments about Plaintiff that led him to report the comments to Elliott occurred during a meeting that was held on March

6, 2024, at which Sgt. Walker addressed the numerous complaints by BCSO personnel about Plaintiff's March 4, 2024 post.  Doc. 31-5 at 2-3.  Lt. Ashton separately wrote a report that described numerous complaints that he received, beginning on March 5, 2024, from BCSO personnel about Plaintiff's March 4, 2024 post, as well as his conclusion the post violated certain policies and the Law Enforcement Code of Ethics.  Doc. 31-5 at 10-13.  Lt. Ashton and Sgt. Walker's reports show concerns had been raised by BCSO personnel about Plaintiff's March 4, 2024 post, before Sgt's Walker's comments to Plaintiff, and Lt. Ashton's conclusion the post violated relevant policies and codes are consistent with the alleged policy violations described in the "Notice Of Pre-Disciplinary Hearing" that was issued to Plaintiff from Lt. Ashton and Major Nolfe's email that amended the notice to include additional violations.

"Temporal proximity between the protected activity and the adverse action alone generally cannot show causation when the employer has contemplated the adverse action before the protected activity takes place." *Tucker v. Fla. Dept' of Transp.*, 678 F. App'x 893, 896 (11th Cir. Feb. 2, 2017).  Indeed, "Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint."  *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1270 (11th Cir. 2010).

The evidence shows there was a legitimate non-discriminatory reason to initiate disciplinary proceedings against Plaintiff for his March 4, 2024 post that preceded Plaintiff's discrimination complaint.  Accordingly, summary judgment is due to be **GRANTED** as to Plaintiff's retaliation claim.

## V.    CONCLUSION

The Court would like to make clear Plaintiff is free to have, and express, his deeply held

religious beliefs, but his employer correspondingly has an interest to ensure its mission to the public is fulfilled. This requires it to maintain functional relationships between personnel to ensure effectiveness and strengthen the public's confidence in its undertaking. When, as here, Plaintiff's expression is not exclusively religious in nature and negatively affects the work environment and can cause concern regarding the mission to the public, Plaintiff cannot divest himself from the collateral consequences of that expression. Plaintiff cannot simply use "religious belief" as a shield against the effects of that expression. When, as here, the expression resulted in a breakdown of employee relationships, which negatively impact the workplace and the mission, and can result in a loss of public confidence in the neutrality of one of its investigating officers, the employer may react accordingly.

Based on the foregoing, the motion for summary judgment (Doc. 32) is **GRANTED**, and Plaintiff Anthony Kiel's claims that he brings against Defendant Anthony Lowery, are **DISMISSED with prejudice**.

A separate judgment will issue pursuant to Fed. R. Civ. P. 58.

**DONE** and **ORDERED** this 2nd day of June 2026.

<u>/s/ Terry F. Moorer</u>
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE